**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
|     Plaintiff/Appellee, ) | |
| ) | |
| vs. ) | Case No. CR–04-198-R |
| ) | (Appeal from M-04-2019-H) |
| JUANITA C. WILSON, a/k/a JANE ) | |
| WILSON, ) | |
| ) | |
|     Defendant/Appellant. ) | |

## MEMORANDUM OPINION AND ORDER

The Defendant, Juanita C. Wilson, also known as Jane Wilson, appeals the judgment and sentence of United States Magistrate Judge Ronald L. Howland.

Following a non-jury trial, the Defendant was convicted on May 19, 2004 of failing to immediately report a reasonable suspicion of child abuse, a Class B misdemeanor, in violation of Title 18 U. S. C. § 1169 (b) (1). On October 21, 2004, the Defendant was sentenced to probation for a period of one year, and a fine of $500.00. On January 26, 2005, the Defendant was discharged from probation upon the recommendation of the assigned probation officer.

The Defendant appeals her sentence and conviction, arguing that the Magistrate Judge's finding of guilt was not supported by the evidence, that she was denied her right to confront witnesses against her, that the Magistrate Judge relied upon evidence outside the record in making its decision, that she was deprived of an impartial tribunal, and that the punishment imposed upon her was excessive.

I.  Summary of the Evidence.

Beginning in 2003, the Defendant was employed by the Cheyenne-Arapaho tribes in one of its Head Start centers for pre-school age children located in Clinton, Oklahoma. The Defendant was initially hired as a Disabilities Manager, but at the time of the incident which led to her conviction, she was serving as the "acting" or temporary administrator of that Head Start center. As the acting director, the Defendant was instructed by her supervisors to "take care of" the facility until they could hire a qualified person, and not to do "anything" without calling her supervisors first to obtain instructions. (Tr. pp. 213, 223 - 224).[1]

On Saturday, October 11, 2003, the Cheyenne-Arapaho Head Start center hosted an Indian taco sale to raise funds. (Tr. p. 56). During the Indian taco sale, some of the center's teachers had been visiting with the chairman of the Parent Committee, whom the Court will refer to as Ms. Doe, and with Melissa Ramsey, a member of the Policy Committee. While this meeting was underway, Ms. Ramsey located the Defendant and asked her to join the discussion. (Tr. p. 215). At this meeting, some of the teachers informed the Defendant that Mr. Alan Byrne, an assistant teacher, had taken some children into a closet to administer verbal discipline. (Tr. pp. 19 - 20, 215 - 216). This was the first time the Defendant had heard of Mr. Byrne taking children into the closet. (Tr. p. 216). There was no suggestion at the Saturday, October 11, 2003 meeting that Mr. Byrne had abused, touched or had any physical contact with the children. Rather, the parties present at the meeting

---

[1] The Defendant testified that she was reprimanded if she acted without instructions from her supervisor, and that she was never given complete managerial authority, because she was "just filling in." (Tr. p. 224).

were concerned that Mr. Byrne had taken children into the closet for discipline, which they considered to be "wrong" or inappropriate. (Tr. pp. 63 - 64, 216 - 217).[2]

Ms. Doe's three-year-old daughter, referred to by the parties as "Jane Doe," was enrolled in the classroom to which Mr. Byrne was assigned. (Tr. p. 20). Ms. Doe left the meeting "very frustrated," and went home and questioned Jane. (Tr. pp. 20 - 21). Ms. Doe testified that Jane Doe told her that Mr. Byrne had taken her into the closet, that he had "touched her down there" and that he had "pee-peed on her head." (Tr. pp. 21, 40, 43).[3]

After speaking with her daughter, Ms. Doe telephoned Melissa Ramsey, the Chairman of the Head Start facility's parent committee, and told Ms. Ramsey that Jane Doe was one of the children who had been taken into the closet. (Tr. p. 21). There is a dispute as to whether Ms. Doe also spoke with the Defendant on Saturday evening, October 11, 2003. Ms. Doe testified at trial that she spoke with the Defendant by telephone at 6:00 p. m. that evening, and that she told the Defendant that Jane Doe had been one of the children who went into the closet, and that "Mr. Alan had acted inappropriately with her." (Tr. p. 21, p. 31). The Defendant, however, testified that she did not speak with Ms. Doe by telephone after the meeting on Saturday October 11, 2003.

Around noon on Monday, October 13, 2003, Melissa Ramsey telephoned the Defendant at the Head Start center, and informed the Defendant that Ms. Doe had told her that Jane Doe had said that Mr. Byrne had taken her into the closet, "pulled her hair, slapped her, and touched her down there." (Tr. pp. 60 - 61, 218, 230). Ms. Doe did not know the date on which Jane was allegedly

---

[2] The Defendant was not told during that meeting that Jane Doe was one of the children taken into the closet. (Tr. pp. 217 - 218).

[3] This testimony is somewhat inconsistent with Melissa Ramsey's version of the events. Ms. Ramsey testified that Ms. Doe told her that Jane Doe said that she had urinated on Mr. Byrne's head. (Tr. p. 211).

taken into the closet or abused. (Tr. pp. 38, 128). The Defendant advised Ms. Ramsey at that time that there were "steps" that had to be taken, and that certain people had to be contacted. (Tr. pp. 28, 43, 60 - 61). Ms. Ramsey told the Defendant that she was with Ms. Doe, and that they were at, or en route to, the Clinton, Oklahoma police station to "have [Mr. Byrne] picked up," based on what Jane Doe had said. (Tr. p. 218). The Defendant didn't discourage them from making a police report, but advised them that the local police would decline to assume jurisdiction over the incident, because the Head Start facility was located on Indian land. (Tr. pp. 61, 218).[4] The Defendant assured Ms. Doe and Ms. Ramsey that she would contact the appropriate authorities as soon as their office opened.[5] The Defendant testified that this telephone conversation was the first time she learned of the allegation that Mr. Byrne had touched Jane Doe. (Tr. pp. 218 - 220). Based on her conversation with Ms. Ramsey, the Defendant believed that Ms. Ramsey and Ms. Doe were reporting the allegations against Mr. Byrne to the Clinton police on October 13, 2003. (Tr. p. 235). The Government also offered evidence that Ms. Doe went to the Head Start facility over her lunch hour on October 13, 2003 and spoke with the Defendant personally. The Defendant denies that she spoke with Ms. Doe personally that day.[6]

---

[4] The Defendant was correct in informing Ms. Ramsey that the Clinton Police Department would not have jurisdiction over the complaint against Mr. Byrne. After speaking with the Defendant, Ms. Ramsey nevertheless contacted the Clinton Police Department, who also advised her that the Department had no jurisdiction over the alleged incident. (Tr. pp. 62 - 63).

[5] Monday, October 13, 2003 was Columbus Day, a legal holiday. (Tr. p. 39). The Cheyenne-Arapaho tribal offices, including the child welfare offices, were closed on that day. (Tr. pp. 126 - 127, 128).

[6] Ms. Doe testified that she went to the Head Start Center over her lunch hour on Monday, October 13, 2003 and spoke with the Defendant in person, to make sure that the Defendant "knew fully what had happened" to Jane Doe. (Tr. pp. 24 - 25). Ms. Doe testified that after this meeting, she was "mad, frustrated" because "things were moving too slowly," and that she never contacted the Defendant again. (Tr. pp. 25 - 27; see also Tr. pp. 61 - 62). The Defendant denies that she visited with Ms. Doe in person that day. (Tr. p. 229).

The Defendant testified that she telephoned her supervisor, Jo Ann Williams, Director of the Cheyenne-Arapaho Head Start programs on October 13, 2003, "immediately" after learning of the allegation that Mr. Byrne had sexually abused Jane Doe.[7]  The Defendant testified that Ms. Williams instructed her to write down what she had been told in a memo, and to "fax it in."  (Tr. pp. 221 - 223).  It is undisputed that the Defendant then immediately wrote a memo to Ms. Williams, outlining the allegations against Mr. Byrne, and sent it to Ms. Williams' Head Start office in Concho, Oklahoma by facsimile transmission.  (Tr. pp. 221 - 222).[8]  The Defendant's memo also advised Ms. Williams that Indian Child Welfare officials should be notified.  (Tr. p. 226).  The Defendant testified at trial that Ms. Williams assured her that she would notify Indian Child Welfare officials "immediately in the morning."  (Tr. p. 226).

It is undisputed that an emergency meeting of the Cheyenne-Arapaho Head Start personnel committee was held on either Monday, October 13 or Tuesday, October 14, 2003.[9]  At this emergency meeting, the personnel committee decided to fire Alan Byrne and some other staff members who knew that he had taken children into the closet.  (Tr. pp. 67 - 68).  Jo Ann Williams testified that she first learned of the sexual abuse allegations against Mr. Byrne when the Defendant brought the memo to her at the emergency meeting.  (Tr. pp. 82 - 84, 89 - 90, 96, 107).  Ms.

---

[7]Jo Ann Williams was the administrator of three Cheyenne-Arapaho Head Start centers, including the one located in Clinton, Oklahoma.  (Tr. p. 78).

[8]Two versions of the memo have been offered into evidence.  One was hand-written by the Defendant, and described in detail what the Defendant had been told.  The other memo gave a more abbreviated version of the allegations, and was typewritten.  Both were sent to Ms. Williams.

[9]It is not clear which day the emergency meeting occurred.  Melissa Ramsey attended the meeting, and could not recall when the meeting was held.  Jo Ann Williams testified that the meeting occurred on October 14, 2003.  (See Tr. pp. 67 - 68; Tr. pp. 82 - 83).

Williams has denied that she spoke with the Defendant by telephone on October 13, 2003. (Tr. p. 105).

Ms. Williams acknowledged that she understood from the Defendant's memo that the Defendant was "leaving it up to [her] to contact Indian Child Welfare" officials, because Ms. Williams was the administrator of the Head Start programs. (Tr. pp. 89, 241). Ms. Williams acknowledged that the Defendant did nothing to try to cover up the allegations against Mr. Byrne. (Tr. p. 91).

Ms. Williams went to the tribal offices on the morning of Wednesday, October 15, 2003, and reported the allegations of "possible child sexual abuse" to Linda Hulbutta, the Coordinator of Indian Child Welfare for the Cheyenne-Arapaho Tribe.[10] (Tr. pp. 80 - 82, 90, 102 - 103, 119). After speaking with Ms. Williams, Ms. Hulbutta contacted the Defendant and obtained more specific information on the allegations involving Jane Doe. (Tr. pp. 122 - 123, 126).[11] The following day, Thursday, October 16, 2003, Ms. Hulbutta contacted tribal law enforcement officers. (Tr. pp. 126, 137).

Later, tribal law enforcement officer Charles Addington contacted the Defendant for more information. Mr. Addington testified that the Defendant cooperated fully with his investigation, and did not try to hide anything from him. (Tr. p. 144). Officer Addington contacted Special Agent Jack

---

[10] At trial, Ms. Williams was questioned at length as to why she did not contact law enforcement or child welfare officials on the same day she received the Defendant's memo. Ms. Williams testified that she didn't contact anyone because "Mrs. Ramsey should have already called the police by then, she was making allegations, she was going to call the police. And I took it from there that the police would already know, the Clinton police." (Tr. p. 107; Tr. pp. 90 - 91).

[11] Ms. Hulbutta testified that when she contacted the Defendant, she asked her whether she had contacted the Department of Human Services or law enforcement officers. The Defendant advised Ms. Hulbutta that she had always been told to contact her supervisor on such matters. (Tr. p. 126, 131).

Hale of the Bureau of Indian Affairs concerning the allegations of sexual abuse on October 16, 2003. (Tr. p. 156). Special Agent Hale conducted no interviews in the case until October 21, 2003, when he contacted the Defendant for the first time. (Tr. pp. 35, 167). Special Agent Hale contacted Ms. Doe for the first time in November 2003, but never interviewed her. (Tr. pp. 161, 168). Jane Doe was never given a medical examination, but was interviewed by specially trained forensic investigators in November 2003. (Tr. p. 32). Special Agent Hale's investigation revealed no other evidence that Mr. Byrne had sexually abused Jane Doe, or that he had even taken Jane Doe into the closet.[12] Law enforcement officers were never able to determine whether Jane Doe was, in fact, sexually assaulted. (Tr. p. 180). Mr. Byrne was never arrested or interviewed.[13] (Tr. p. 179).

## II. Sufficiency of the Evidence.

In this appeal from the conviction entered by a magistrate judge, the standard of review is the same as that which would be applied on an appeal to a court of appeals. The Magistrate Judge's conclusions of law are subject to de novo review, while his findings of fact are reviewed only for clear error. *United States v. James,* 164 F. Supp. 2d 718 (D. Md. 2001). In assessing the sufficiency of the evidence to sustain the Magistrate Judge's findings, the question is whether the Magistrate Judge's findings, when viewed in the light most favorable to the Government, were clearly erroneous. *See United States v. Hughes,* 542 F. 2d 246 (5th Cir. 1976), *citing* Rules of Procedure for the Trial of Minor Offenses Before United States Magistrates, Rule 8 (d); *United States v. Ramirez,* 555 F. Supp. 736, 739 (E. D. Cal. 1983). "Clear error," in this context, is more than a mere

---

[12] Special Agent Hale testified that none of the witnesses he interviewed had ever seen Mr. Byrne take Jane Doe into the closet. (Tr. pp. 176 - 178). In fact, witnesses advised Special Agent Hale that "no one [had] reported seeing Alan [Byrne] taking girls into the storage closet, just boys." (Tr. pp. 177 - 178).

[13] According to Special Agent Hale, Mr. Byrne's attorney would not allow him to be interviewed.

difference of opinion between the original fact-finder and the appellate reviewer. To be clearly erroneous, a finding must leave the reviewer with a definite and firm conviction that a mistake has been made. *Id.; Anderson v. Bessemer City,* 470 U. S. 564, 573, 105 S. Ct. 1504, 84 L. Ed. 2d 518 (1985).

For purposes of this appeal, the Court views the evidence in the light most favorable to the Government. *Hughes, supra.* Even under that standard, however, it is undisputed that the Defendant first learned on Monday, October 13, 2003 of young Jane Doe's allegation that Mr. Byrne had sexually abused her. Prior to that time, the Defendant had been told, at most, that Mr. Byrne had taken children, including Jane Doe, into the closet, and that he had acted "inappropriately."[14] To the extent that the Defendant is a mandatory reporter under Title 18 U. S. C. § 1169, her obligations under that statute arose only when she had a "reasonable suspicion" that Jane Doe had been sexually abused. Title 18 U. S. C. § 1169 (a) (1). The Court finds from the undisputed evidence that the Defendant first had a reasonable suspicion of child sexual abuse when she spoke with Ms. Ramsey and/or Ms. Doe at around noon on Monday, October 13, 2003.

Whether the Defendant responded appropriately to the allegations supporting a reasonable suspicion of child abuse must be viewed in context. It is undisputed that at the time the Defendant first learned that Jane Doe had accused Mr. Byrne of touching her "down there," the Defendant knew that Ms. Ramsey and Ms. Doe were at, or en route to, the Clinton police station to make a

---

[14]As explained above, the Defendant disputes Ms. Doe's testimony that she telephoned the Defendant after the meeting on October 11, 2003. Even accepting Ms. Doe's testimony as true, the Government has established, at most, that Ms. Doe told the Defendant on October 11 that Jane Doe had been one of the children who was taken into the closet, and that "Mr. Alan had acted inappropriately." (Tr. p. 21, p. 31). This conversation, without more, would not have supported a reasonable suspicion that Jane Doe had been sexually abused.

police report.[15] It is undisputed that Monday, October 13, 2003 was a federal holiday, and that the tribal child welfare offices, to whom the allegations were later reported, were closed. It is further undisputed that the Defendant had been instructed to first report any incidents of this nature to her supervisor. Although there is some question as to when the Defendant's supervisor received the memo, it is undisputed that the Defendant sent a full report of the allegations to her supervisor immediately, in a memo sent by fax and marked "URGENT."[16] It is undisputed that the Defendant's supervisor did, in fact, notify the appropriate tribal law enforcement authorities on October 15, 2003.

In reviewing the sufficiency of the Government's evidence that the Defendant violated Section 1169, the Court considers both the plain language and the legislative purpose of the statute. Although the Defendant did not directly contact law enforcement officers, it is undisputed that the appropriate law enforcement officials were contacted by the Defendant's supervisor. At most, there was a two-day delay in reporting the allegations to the appropriate law enforcement officials. The delay apparently resulted from a number of factors, but was not caused by any willful failure on the part of the Defendant. Because the alleged perpetrator was not living in Jane Doe's home, and had been removed from the Head Start facility, the delay did not subject Jane Doe or other children to the risk of further abuse. The trained law enforcement officers who investigated the allegations of abuse did not deem it necessary to interview Jane Doe until the following month. Under the circumstances, it is clear that the Defendant took reasonable steps to ensure that the allegations

---

[15]The Defendant correctly advised Ms. Ramsey that the Clinton, Oklahoma police would not take jurisdiction over the incident, since it occurred on Indian territory.

[16]The Defendant testified that she also telephoned Ms. Williams, her supervisor, "immediately" after this conversation with Ms. Ramsey and advised her of the allegations against Mr. Byrne. Ms. Williams, however, denied that this conversation took place, and testified that she did not receive the Defendant's faxed memo until the following day, October 14, 2003.

against Mr. Byrne were reported to the appropriate law enforcement officials. The Court finds the evidence, viewed in the light most favorable to the Government, to be insufficient to sustain the Defendant's conviction for failing to report child abuse under Title 18 U. S. C. § 1169 (a) (1).[17] In light of this finding, the Court need not address the Defendant's contentions that she was denied her right to confront witnesses, that the Magistrate Judge relied on evidence outside the record, that she was deprived of an impartial tribunal, and that her punishment was excessive.

III. Conclusion.

The Defendant's conviction and sentence are hereby REVERSED. The case is hereby REMANDED to the United States Magistrate Judge with instructions to dismiss.

**IT IS SO ORDERED this 11th day of May, 2005.**

_____
DAVID L. RUSSELL
UNITED STATES DISTRICT JUDGE

---

[17] The Magistrate Judge found that the Defendant had reacted to the allegations against Mr. Byrnes by firing people, and concluded that this was prima facie evidence that the Defendant had a reasonable suspicion of child abuse. (Tr. p. 206). In fact, the evidence indicates that the Defendant, as the temporary acting director, had no authority to hire or fire employees, and that the firings were ordered by management-level officials. (Tr. p. 227).